## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

RAMON WARD,                                )
                                           )
              Plaintiff,                    )
                                           )
       v.                                   )        No. 21-cv-12742
                                           )
COUNTY OF WAYNE,                            )        Demand For Jury Trial
ROBERT AGACINSKI,                           )
NANCY WESTVELD, JANET NAPP,                 )
MONICA CHILDS, DANNY MAYNARD,               )
DALE COLLINS, FRED JORGENSEN,               )
TONY SANDERS, MARK THOMAS, and              )
UNKNOWN EMPLOYEES OF THE                    )
WAYNE COUNTY PROSECUTOR'S                    )
OFFICE AND THE DETROIT POLICE               )
DEPARTMENT,                                 )
                                           )
              Defendants.                   )

## <u>COMPLAINT</u>

Plaintiff, Ramon Ward, by and through counsel, Smietanka Law Group and

the Law Office of Jarrett Adams PLLC, complains against Defendants, County of

Wayne, Robert Agacinski, Nancy Westveld, Janet Napp, Monica Childs, Danny

Maynard, Dale Collins, Fred Jorgensen, Tony Sanders, Mark Thomas, and

Unknown Employees of the Wayne County Prosecutor's Office and the Detroit

Police Department as follows:

## INTRODUCTION

1.     Pursuant to 42 U.S.C. §1983, this is a federal civil rights action by

Plaintiff, Ramon Ward, an innocent man, who was unlawfully arrested and

detained, sexually assaulted, unfairly prosecuted, and wrongfully convicted of

murder in the County of Wayne as a result of Defendants' conduct. Mr. Ward

spent 25 years and 10 months in jail and prison for a crime he did not commit.

Defendants' conduct deprived Mr. Ward of his rights guaranteed to him under the

United States Constitution, and also constituted tortious conduct under State of

Michigan law. Mr. Ward seeks to obtain compensatory damages, punitive

damages, costs and attorneys' fees for Defendants' conduct. This action also seeks

injunctive and equitable relief against the County of Wayne to reform the

unconstitutional policy and/or custom that was the moving force behind the

constitutional rights violations suffered by Mr. Ward.

## JURISDICTION

2.     This action is brought under 42 U.S.C. § 1983 to address the

deprivation under color of law of Ramon Ward's rights as secured by the United

States Constitution and under Michigan state law.

3.     The Court has jurisdiction over Ramon Ward's federal claims

pursuant to 28 U.S.C. §§ 1331 and 1343, and has supplemental jurisdiction over

Mr. Ward's state law claims pursuant to 28 U.S.C. § 1367.

4.     Venue is proper under 28 U.S.C. § 1391 because the Eastern District of Michigan is the judicial district where the constitutional rights violations suffered by Ramon Ward occurred.

## PARTIES

5.     Plaintiff, Ramon Ward is a citizen of the United States of America who at all relevant times resided in the State of Michigan.

6.     Defendant, County of Wayne ("Defendant County"), is a body corporate under Article VII, Section 1 of the Michigan Constitution. At all relevant times, Defendant County was the principal and employer of Defendants, Robert Agacinski, Nancy Westveld, and Janet Napp who acted pursuant to Defendant County's policies and customs.

7.     Defendant, Robert Agacinski ("Defendant Agacinski"), at all relevant times, was an adult resident of the State of Michigan and was an assistant prosecuting attorney for the Wayne County Prosecutor's Office ("WCPO"), which is a department of Defendant County.

8.     Defendant, Nancy Westveld ("Defendant Westveld"), at all relevant times, was an adult resident of the State of Michigan and was an assistant prosecuting attorney for the WCPO, which is a department of Defendant County.

9.     Defendant, Janet Napp ("Defendant Napp"), at all relevant times, was an adult resident of the State of Michigan and was an assistant prosecuting attorney for the WCPO, which is a department of Defendant County.

10.     Defendant, Monica Childs ("Defendant Childs"), at all relevant times, was an adult resident of the State of Michigan and was a Detroit Police Department ("DPD") detective.

11.     Defendant, Danny Maynard ("Defendant Maynard"), at all relevant times, was an adult resident of the State of Michigan and was a DPD police officer.

12.     Defendant, Dale Collins ("Defendant Collins"), at all relevant times, was an adult resident of the State of Michigan and was a DPD detective.

13.     Defendant, Fred Jorgensen ("Defendant Jorgensen"), at all relevant times, was an adult resident of the State of Michigan and was a DPD police officer.

14.     Defendant, Tony Sanders ("Defendant Sanders"), at all relevant times, was an adult resident of the State of Michigan and was a DPD sergeant.

15.     Defendant, Mark Thomas ("Defendant Thomas"), at all relevant times, was an adult resident of the State of Michigan and was a DPD police officer.

16.     Defendants, Unknown Employees of the Wayne County Prosecutor's Office and the Detroit Police Department, at all relevant times, were adult residents of the State of Michigan.

## FACTS

**Facts Pertaining to the Unlawful Arrest and Detention of, Sexual Assault of, the Use of Fabricated Evidence against, Concealment of Exculpatory Evidence from, and Malicious Prosecution of Ramon Ward**

17.     On January 25, 1994, the bodies of Denise Sharon Cornell ("Cornell") and Joan Gilliam ("Gilliam") were found in a vacant home located in Detroit, Michigan.

18.     Cornell and Gilliam were murder victims who died of gunshot wounds to the head.

19.     Ramon Ward did not shoot or kill Cornell and Gilliam.

20.     Defendant Collins was in charge of the DPD investigation into the murders of Cornell and Gilliam.

21.     On January 28, 1994, Defendant Maynard took a statement from a witness about the murders of Cornell and Gilliam.

22.     In the statement, when asked by Defendant Maynard who would want to harm Cornell, the witness responded by identifying the person later identified as the actual killer of Cornell and Gilliam.

23.     In the statement, the witness told Defendant Maynard that the person later identified as the actual killer of Cornell and Gilliam had beaten Cornell a week earlier over an alleged burglary.

24.     On January 28, 1994, an unknown DPD officer wrote a progress note identifying as a suspect the person later identified as the actual killer of Cornell and Gilliam.

25.     On January 29, 1994, Defendant Collins took a statement from a witness about the murders of Cornell and Gilliam.

26.     In the statement, the witness described for Defendant Collins a suspect in the murders of Cornell and Gilliam which did not match the description of Ramon Ward but instead matched the description of the person later identified as the actual killer of Cornell and Gilliam.

27.     During the statement, Defendant Collins asked the witness if he knew the person later identified as the actual killer of Cornell and Gilliam and the witness responded that he did not.

28.     On April 20, 1994, at the direction of Defendant Childs, Defendant Jorgensen, Defendant Sanders, and Defendant Thomas arrested Ramon Ward and his brother for the murders of Cornell and Gilliam.

29.     There was no warrant for the arrest of Ramon Ward.

30.     There were no facts to support either reasonable suspicion to detain or probable cause to arrest Ramon Ward for the murders of Cornell and Gilliam.

31.     The DPD arrested at least two other suspects in the murders of Cornell and Gilliam prior to arresting Ramon Ward.

32.     Defendant Jorgensen, Defendant Sanders, and Defendant Thomas conveyed Ramon Ward to DPD headquarters.

33.     Defendant Childs interrogated Ramon Ward at DPD headquarters on April 20, 1994.

34.     Ramon Ward told Defendant Childs that he wanted a lawyer and did not want to talk to her.

35.     Defendant Childs denied Ramon Ward's request for a lawyer.

36.     During Defendant Childs' interrogation, Ramon Ward denied any involvement in the murders of Cornell and Gilliam.

37.     Ramon Ward provided Defendant Childs with a signed, written statement that he did not commit the murders of Cornell and Gilliam.

38.     During Defendant Childs' interrogation, Defendant Collins and DPD Lieutenant William Rice restrained Ramon Ward and used phone books to beat Mr. Ward below the neck.

39.     After Defendant Childs' interrogation, unknown DPD officers took Ramon Ward to a cell in the 9th floor lockup of DPD headquarters.

40.     Joe Twilley ("Twilley") and Oliver Cowan ("Cowan") also were being held in the 9th floor lockup of DPD headquarters on April 20, 1994.

41.     Twilley and Cowan were violent felons.

42.    Twilley and Cowan were trustees, who were able to leave their cells and move freely around the 9th floor lockup of DPD headquarters.

43.    The WCPO and/or the DPD placed Twilley and Cowan in the 9th floor lockup of DPD headquarters, acting as agents of the WCPO and/or the DPD, for the purpose of obtaining false confessions from their fellow inmates in exchange for valuable incentives such as deals in their criminal cases, conjugal visits, drugs, and alcohol, as will be set forth in detail below.

44.    The WCPO and/or the DPD allowed Twilley and Cowan free access to other inmates for the purpose of obtaining the false confessions.

45.    The WCPO and/or the DPD failed to supervise Twilley and Cowan as they obtained false confessions from other inmates.

46.    The WCPO and/or the DPD did not care how Twilley and Cowan obtained false confessions from other inmates.

47.    The WCPO and/or the DPD gave Twilley and Cowan drugs and alcohol.

48.    The WCPO and/or the DPD failed to screen Twilley and Cowan for weapons.

49.    Ramon Ward had never met Twilley or Cowan prior to April 20, 1994.

50.     On April 20, 1994, Twilley came to Ramon Ward's cell and tried to engage Mr. Ward in conversation.

51.     Ramon Ward refused to engage Twilley in conversation and Twilley left Mr. Ward's cell.

52.     Approximately 30-45 minutes later, Cowan came to Ramon Ward's cell, threatened Mr. Ward, and sexually assaulted Mr. Ward while holding a makeshift glass knife to Mr. Ward's neck.

53.     No one from the WCPO or the DPD prevented Cowan's sexual assault of Ramon Ward.

54.     Ramon Ward never told Twilley or Cowan that he murdered Cornell and Gilliam.

55.     On April 21, 1994, Defendant Childs interrogated Ramon Ward for a second time.

56.     Defendant Childs claimed that Ramon Ward during the April 21, 1994 interrogation admitted to killing Cornell and Gilliam, and then denied killing them.

57.     Ramon Ward never told Defendant Childs that he killed Cornell and Gilliam.

58.     The criminal proceedings against Ramon Ward were in the State of Michigan Recorders Court for the City of Detroit and were captioned *People of the State of Michigan vs. Ramon Ward*, Recorders Court Number 94-4942.

59.     A felony complaint was issued against Ramon Ward on April 23, 1994.

60.     Defendant Childs was the complaining witness for the felony complaint.

61.     Defendant Maynard signed the felony complaint.

62.     Ramon Ward was arraigned on April 25, 1994 and Mr. Ward pleaded not guilty.

63.     There was a Preliminary Examination Hearing in the criminal proceedings against Ramon Ward on May 5, 1994.

64.     Defendant Westveld appeared for the WCPO at the Preliminary Examination Hearing.

65.     Defendant Westveld called Twilley to testify at the Preliminary Examination Hearing.

66.     Twilley falsely testified at the Preliminary Examination Hearing that Ramon Ward confessed to killing Cornell and Gilliam.

67.     Twilley falsely testified at the Preliminary Examination Hearing that he only once previously provided testimony in a criminal case against a defendant.

68.     Twilley falsely testified at the Preliminary Examination Hearing that he was not promised anything by the WCPO or the DPD in exchange for his testimony.

69.    Twilley admitted during the Preliminary Examination Hearing that he knew Defendant Childs and Defendant Collins.

70.    Cowan falsely testified at the Preliminary Examination Hearing that Ramon Ward confessed to killing Cornell and Gilliam.

71.    Cowan falsely testified at the Preliminary Examination Hearing that he had only once or twice previously provided information about a criminal defendant.

72.    Cowan falsely testified at the Preliminary Examination Hearing that he never received a benefit for providing information about a criminal defendant.

73.    At the conclusion of the Preliminary Examination Hearing, the court bound Ramon Ward over for trial for the murder of Cornell and Gilliam.

74.    Defendant Westveld never corrected Twilley and Cowan's false testimony during the Preliminary Examination Hearing.

75.    No one from the WCPO or the DPD ever corrected Twilley and Cowan's false testimony from the Preliminary Examination Hearing.

76.    On July 8, 1994, the State of Michigan Recorders Court for the City of Detroit held a hearing out of public view regarding Cowan acting as an informant for the WCPO and/or the DPD.

77.    William Heaphy ("Heaphy") appeared for the WCPO at the hearing.

78.     Heaphy agreed that the hearing should be conducted out of public view.

79.     During the hearing, DPD Sergeant William Peterson ("Peterson") testified that Cowan helped with the murder case against Ramon Ward, which would have been unsolved forever without Cowan's help.

80.      During the hearing, Peterson testified that there were six people incarcerated for murder who would not be without Cowan's help.

81.     During the hearing, Peterson testified that he expected Cowan's help with criminal cases in the future.

82.     At the conclusion of the hearing, the court acknowledged that Cowan could be sentenced for five to fifteen years in his criminal case, but the court instead sentenced Cowan to one year of probation and one year in the William Dickerson Detention Facility on the condition of Cowan's continued assistance in criminal cases.

83.     Heaphy did not object to Cowan's sentencing.

84.      On July 27, 1994, the State of Michigan Recorders Court for the County of Wayne held a hearing out of public view regarding Twilley acting as an informant for the WCPO and/or the DPD.

85.     Rosemary Gordon ("Gordon") appeared for the WCPO at the hearing.

86.    Gordon agreed that the hearing should be conducted out of public view.

87.    During the hearing, Defendant Collins testified that Twilley had testified in at least 20 homicide cases.

88.    During the hearing, Defendant Collins testified that Twilley had assisted with numerous homicide investigations.

89.    During the hearing, Defendant Collins testified that there were several homicide cases that could not have been prosecuted with Twilley's testimony, including a recent homicide case.

90.    During the hearing, Gordon stated that Twilley had been extremely helpful to WCPO prosecutor Thomas Beadle ("Beadle") in an arson/homicide case.

91.    During the hearing, Gordon stated that Beadle supported consideration for Twilley.

92.    During the hearing, Gordon stated that she learned from other people who worked for the WCPO that Twilley had come to court to testify on numerous occasions.

93.    On July 29, 1994, the Recorders Court for Defendant County held a sentencing hearing for Twilley.

94.    Michael J. King ("King") appeared for the WCPO at the hearing.

95.     During the hearing, the court re-sentenced Twilley to less than five years and ordered his immediate release so that he did not have to return to prison.

96.     King did not object to Twilley's re-sentencing and his release from prison.

97.     On September 2, 1994, there was an Evidentiary Hearing in the criminal proceedings against Ramon Ward.

98.     Defendant Westveld appeared for the WCPO at the Evidentiary Hearing.

99.     During the hearing, Defendant Childs testified that Ramon Ward was arrested for the purpose of investigating the murders of Cornell and Gilliam.

100.    During the hearing Defendant Childs testified that the only information she had for the arrest of Ramon Ward was that Jimmie Lee Stancil ("Stancil") implicated Mr. Ward in the murders of Cornell and Gilliam.

101.    When Stancil made the statement to Defendant Childs implicating Ramon Ward in the murders of Cornell and Gilliam, Stancil was in DPD custody and was a suspect in the murders of Cornell and Gilliam.

102.    During the Evidentiary Hearing, Defendant Westveld never informed the Court or Ramon Ward that Twilley and Cowan had provided false testimony during the Preliminary Examination Hearing.

103.   During the Evidentiary Hearing, Defendant Westveld never informed the Court or Ramon Ward that Twilley and Cowan had received significant sentence reductions in their criminal cases in exchange for their testimony against criminal defendants including Mr. Ward.

104.   No one from the WCPO or the DPD ever informed the Court or Ramon Ward that Twilley and Cowan had received significant sentence reductions in their criminal cases in exchange for their testimony against criminal defendants including Mr. Ward.

105.   The trial in the criminal proceedings against Ramon Ward began on January 24, 1995 and ended on January 26, 1995.

106.   Defendant Agacinski appeared for the WCPO at the trial.

107.   During the trial, witness Lenora Butchee ("Butchee") testified that the DPD had arrested her for the murders of Cornell and Gilliam prior to arresting Ramon Ward and his brother.

108.   Defendant Agacinski called Twilley to testify at the trial.

109.   Twilley falsely testified at trial that Ramon Ward told him that he killed Cornell and Gilliam.

110.   Twilley testified at trial that he gave a verbal statement to Defendant Childs implicating Ramon Ward in the murders of Cornell and Gilliam.

111.   Twilley testified at trial that he gave a written statement to Defendant Maynard implicating Ramon Ward in the murders of Cornell and Gilliam.

112.   Twilley falsely testified at trial that he received no deal for his statements and testimony against Ramon Ward.

113.   During the trial, Defendant Agacinski read to the jury Cowan's false testimony from the Preliminary Examination Hearing because Cowan had died prior to the trial.

114.   Defendant Childs testified at trial that Defendant Collins was in charge of the investigation into the murders of Cornell and Gilliam.

115.   Defendant Childs testified at trial that she used the Constitutional Rights Certificate of Notification Form to advise Ramon Ward of his constitutional rights.

116.   Defendant Childs testified at trial that the spot on the Constitutional Rights Certificate of Notification Form to indicate that Ramon Ward was literate, understood his constitutional rights, and agreed to make a voluntary statement was not signed or checked.

117.   Defendant Childs testified at trial that Ramon Ward was merely a suspect in the murders of Cornell and Gilliam when Mr. Ward was arrested.

118.   Stancil testified at trial that his prior statement to Defendant Childs about Ramon Ward admitting to the murders of Cornell and Gilliam was untrue.

119.   There was no evidence introduced at the trial linking Ramon Ward to the murders of Cornell and Gilliam, other than the false witness testimony.

120.   At the conclusion of the trial, the jury found Ramon Ward guilty of the murders of Cornell and Gilliam.

121.   During the trial, Defendant Agacinski never informed the Court or Ramon Ward that Twilley had provided false testimony at trial or that Cowan's Preliminary Examination Hearing testimony was false.

122.   No one from the WCPO or the DPD ever informed the Court or Ramon Ward that Twilley had provided false testimony at trial or that Cowan's Preliminary Examination Hearing testimony was false.

123.   During the trial, Defendant Agacinski never informed the Court or Ramon Ward that Twilley and Cowan had received significant sentence reductions in their criminal cases in exchange for their testimony against criminal defendants including Mr. Ward.

124.   No one from the WCPO or the DPD ever informed the Court or Ramon Ward that Twilley and Cowan had received significant sentence reductions in their criminal cases in exchange for their testimony against criminal defendants including Mr. Ward.

125.   In 1995, Defendant Agacinski was the Deputy Chief Assistant Prosecutor for the WCPO.

126.   In early1995, several attorneys for criminal defendants expressed concerns to Defendant Agacinski about the practice of placing inmate informants in the DPD headquarters 9th floor lockup to obtain confessions from their fellow inmates.

127.   In response to the concerns expressed by the attorneys, Defendant Agacinski wrote a memorandum to WCPO Chief of Operations Richard Padzieski ("Padzieski") dated February 8, 1995.

128.   In the memorandum, Defendant Agacinski stated that he had been told that inmate informants lie about overhearing confessions and/or fabricate confessions to receive deals or favors promised to them.

129.   In the memorandum, Defendant Agacinski identified Twilley and Cowan as inmate informants who testified to fellow inmate confessions in several criminal cases.

130.   In the memorandum, Defendant Agacinski stated that Twilley and Cowan obtained a confession in a criminal case Defendant Agacinski had tried the prior month, which likely was a reference to the Ramon Ward criminal case.

131.   In the memorandum, Defendant Agacinski also identified Solomon Tolbert ("Tolbert") and John Hewitt-El ("Hewitt-El") as individuals who acted as inmate informants.

132.    Defendant Agacinski never provided the memorandum to the Court in the criminal proceedings against Ramon Ward or to Mr. Ward.

133.    No one from the WCPO ever provided the memorandum to the Court in the criminal proceedings against Ramon Ward or to Mr. Ward.

134.    On February 16, 1995, there was a Sentencing Hearing in the criminal proceedings against Ramon Ward.

135.     Defendant Agacinski appeared for the WCPO at the Sentencing Hearing.

136.    During the Sentencing Hearing, Ramon Ward maintained his innocence and expressed his hope that the real killers of Cornell and Gilliam would be brought to justice.

137.    At the conclusion of the Sentencing Hearing, the Court sentenced Ramon Ward to life without parole for the first murder charge, 40 to 60 years for the second murder charge, and two years for a felony firearm charge.

138.    During the Sentencing Hearing, Defendant Agacinski never informed the Court or Ramon Ward that Twilley and Cowan had been identified as inmate informants who lie about overhearing confessions and/or fabricate confessions to receive deals or favors promised to them.

139.    During the Sentencing Hearing, no one from the WCPO or the DPD informed the Court or Ramon Ward that Twilley and Cowan had been identified as

inmate informants who lie about overhearing confessions and/or fabricate confessions to receive deals or favors promised to them.

140.   In response to Defendant Agacinski's memo, WCPO Chief of Research, Training, and Appeals Timothy A. Baughman ("Baughman") also wrote a memorandum to Padzieski dated March 1, 1995.

141.   In the memorandum, Baughman stated that inmate informants frequently provide false testimony of other inmates' confessions to obtain compensation for their testimony.

142.   No one from the WCPO ever provided the Baughman memorandum to the Court in the criminal proceedings against Ramon Ward or to Mr. Ward.

143.   On February 19, 1999, there was a Post-Conviction Remand Hearing in the criminal proceedings against Ramon Ward to determine whether there was probable cause for the arrest of Mr. Ward.

144.   Defendant Napp appeared for the WCPO at the Post-Conviction Remand Hearing.

145.   Stancil testified during the Post-Conviction Remand Hearing.

146.   Stancil testified at the Post-Conviction Remand Harding that he was under arrest as a suspect in the murders of Cornell and Gilliam when he falsely implicated Ramon Ward in the murders.

147.    Stancil testified at the Post-Conviction Remand Hearing that Defendant Childs told him that Ramon Ward had implicated Stancil in the murders of Cornell and Gilliam.

148.    Defendant Childs testified during the Post-Conviction Remand Hearing.

149.    Defendants Childs testified at the Post-Conviction Remand Hearing that she arrested a number of suspects in the murders of Cornell and Gilliam, including Stancil, Butchee, Ramon Ward, and Mr. Ward's brother.

150.    Defendants Childs testified at the Post-Conviction Remand Hearing that Ramon Ward was the last person she arrested for the murders of Cornell and Gilliam.

151.    During the Post-Conviction Remand Hearing, Defendant Napp never informed the Court or Ramon Ward about Twilley and Cowan's false testimony, the deals Twilley and Cowan received for their testimony, or the Agacinski and Baughman memorandums.

152.    On November 25, 2003, there was a Motion for Relief from Judgment Hearing in the criminal proceedings against Ramon Ward.

153.    Defendant Napp appeared for the WCPO at the Motion for Relief from Judgment Hearing.

154.    Hewitt-El testified at the Motion for Relief from Judgment Hearing.

155.   Hewitt-El testified at the Motion for Relief from Judgment Hearing that Cowan told him that he could receive a deal in his murder case like Cowan and Twilley did if he helped in the Andre Grayson murder case.

156.   Hewitt-El testified at the Motion for Relief from Judgment Hearing that Twilley told him that the DPD gave Twilley information that Twilley could testify to in exchange for a plea deal in Twilley's criminal case.

157.   Hewitt-El testified at the Motion for Relief from Judgment Hearing that the DPD supplied him with the information that he could testify to in three different cases, but Hewitt-El took the Fifth Amendment as to whether he lied in the three cases.

158.   Hewitt-El testified at the Motion for Relief from Judgment Hearing that the DPD provided him with conjugal visits while in the 9th floor lockup of DPD headquarters in exchange for his help in the criminal cases.

159.   Hewitt-El testified at the Motion for Relief from Judgment Hearing that he received marijuana and alcohol while in the 9th floor lockup of DPD headquarters in exchange for his help in the criminal cases.

160.   Defendant Collins testified at the Motion for Relief from Judgment Hearing.

161.   Defendant Collins testified at the Motion for Relief from Judgment Hearing that Twilley provided assistance in 20 homicide cases.

22

162.   During the Motion for Relief from Judgment Hearing, Defendant Napp never informed the Court or Ramon Ward about Twilley and Cowan's false testimony, the deals Twilley and Cowan received for their testimony, or the Agacinski and Baughman memorandums.

163.   Eventually the WCPO Conviction Integrity Unit conducted a review of the criminal proceedings against Ramon Ward.

164.   Following the review, the WCPO agreed that Ramon Ward's criminal convictions should be voided.

165.   On February 20, 2020, the criminal proceedings against Ramon Ward terminated in Mr. Ward's favor when the Wayne County Circuit Court issued an order vacating the convictions and sentences against Mr. Ward and dismissing all charges against Mr. Ward.

166.    After 25 years and 10 months, Ramon Ward was finally released from prison.

167.   The conduct of Defendant Agacinski, Defendant Westveld, Defendant Napp, Defendant Childs, Defendant Maynard, Defendant Collins, Defendant Jorgensen, Defendant Sanders, Defendant Thomas, and Defendant Unknown Employees of the Wayne County Prosecutor's Office and the Detroit Police Department, as set forth in the preceding paragraphs, was done under color of law

and was within the course and scope of their employment with the WCPO and the DPD.

168.   The conduct of Defendant Agacinski, Defendant Westveld, Defendant Napp, Defendant Childs, Defendant Maynard, Defendant Collins, Defendant Jorgensen, Defendant Sanders, Defendant Thomas, and Defendant Unknown Employees of the Wayne County Prosecutor's Office and the Detroit Police Department, as set forth in the preceding paragraphs, resulted in damages and injuries to Ramon Ward, including but not limited to loss of liberty, physical injury and sickness, and severe emotional pain and suffering.

169.   The conduct of Defendant Agacinski, Defendant Westveld, Defendant Napp, Defendant Childs, Defendant Maynard, Defendant Collins, Defendant Jorgensen, Defendant Sanders, Defendant Thomas, and Defendant Unknown Employees of the Wayne County Prosecutor's Office and the Detroit Police Department, as set forth in the preceding paragraphs, was a proximate cause of Ramon Ward's damages and injuries.

170.   The conduct of Defendant Agacinski, Defendant Westveld, Defendant Napp, Defendant Childs, Defendant Maynard, Defendant Collins, Defendant Jorgensen, Defendant Sanders, Defendant Thomas, and Defendant Unknown Employees of the Wayne County Prosecutor's Office and the Detroit Police Department, as set forth in the preceding paragraphs, was objectively

unreasonable, intentional, purposeful, knowing, willful, wanton, and/or reckless, and was undertaken with malice and/or reckless disregard of Ramon Ward's constitutional rights.

**Facts Pertaining to Defendant County's Unconstitutional Policy and/or Custom of the WCPO Obtaining False Statements and False Testimony for Use Against Criminal Defendants and Concealing the Fact that the Statements and Testimony Were False from Courts and Criminal Defendants**

171.   The policymakers for Defendant County and the WCPO are the Wayne County Executive, the Wayne County Commission, and/or the Wayne County Prosecuting Attorney.

172.   As will be set forth below, Defendant County had/has a policy of the WCPO obtaining false statements and false testimony for use against criminal defendants.

173.   As will be set forth below, Defendant County had/has a custom of tolerance and/or acquiescence of the WCPO obtaining false statements and false testimony for use against criminal defendants.

174.   Defendant County's policymakers were/are aware of the policy and/or custom of the WCPO obtaining false statements and false testimony for use against criminal defendants prior to and after the constitutional violations suffered by Ramon Ward, but have failed to take action to remedy the problem.

175.    As will be set forth below, Defendant County had/has a policy of the WCPO concealing the fact that the statements and testimony were false from courts and criminal defendants.

176.    As will be set forth below, Defendant County had/has a custom of tolerance and/or acquiescence of the WCPO concealing the fact that the statements and testimony were false from courts and criminal defendants.

177.    Defendant County's policymakers were/are aware of the policy and/or custom of the WCPO. concealing the fact that the statements and testimony were false from courts and criminal defendants prior to and after the constitutional violations suffered by Ramon Ward, but have failed to take action to remedy the problem.

178.    The WCPO and the DPD had/have a pattern and practice where inmate informants were/are planted in the DPD headquarters 9th floor lockup to lie by claiming that their fellow inmates confessed to crimes.

179.    The WCPO and the DPD have used these fabricated confessions against criminal defendants to bolster weak cases, such as the case against Ramon Ward.

180.    The WCPO and the DPD have used these fabricated confessions to obtain criminal convictions in cases where the conviction could not have been obtained without the fabricated confessions, such as the case against Ramon Ward.

181.   The WCPO and the DPD did not use these fabricated confessions for the purpose of bringing criminal offenders to justice, but instead to obtain criminal convictions regardless of innocence, such as the case against Ramon Ward.

182.   The WCPO called the inmate informants to falsely testify about the fabricated confessions at the criminal trials of their fellow inmates, such as the case against Ramon Ward.

183.   The WCPO and the DPD concealed the fact that the confessions were fabricated from courts and criminal defendants, such as the case against Ramon Ward.

184.   The WCPO and/or the DPD provided favors and/or lenient treatment to the inmate informants in exchange for the informants fabricating confessions from their fellow inmates and/or for falsely testifying to the fabricated confessions.

185.   Inmate informants housed at the DPD headquarters 9th floor lockup received favors not available at the jail or to non-informants at the lockup in exchange for the informants' false statements and/or false testimony.

186.   Inmate informants have been able to have outside visitors bring them food and drugs.

187.   Inmate informants have been able to invite guests to the DPD headquarters for conjugal visits.

188.   Twilley is an example of an inmate informant to whom the WCPO and/or the DPD gave leniency in exchange for fabricated inmate confessions.

189.   Twilley provided false statements and/or false testimony in approximately 20 homicide cases prosecuted by the WCPO and the DPD.

190.   In exchange for acting as an inmate informant, the WCPO and the DPD agreed that Twilley's criminal sentence of 12-25 years should be reduced to less than five years and that Twilley be released from custody.

191.   Another example of inmate informants to whom the WCPO and/or the DPD gave leniency in exchange for fabricated inmate confessions is Cowan.

192.   Cowan falsely testified in six murder cases prosecuted by the WCPO and the DPD.

193.   In exchange for acting as an inmate informant, the WCPO and the DPD agreed that Cowan's possible criminal sentence of 5-15 years be limited to only one year in jail and one year of probation.

194.   Edward Chico Allen ("Allen") is another inmate informant for the WCPO and/or the DPD.

195.   The WCPO and/or the DPD provided Allen with immunity from prosecution, sexual favors, drugs, food, and/or money in exchange for Allen's false statements and false testimony.

196.   Allen provided false statements and false testimony in the murder case against Larry Smith and numerous other murder cases for the WCPO and/or the DPD.

197.   Allen was shown police reports so that he could falsely state and testify that his fellow inmates confessed to the information contained in the police reports.

198.   Another example of inmate informants to whom the WCPO and/or the DPD gave leniency in exchange for inmate confessions is Hewitt-El.

199.   Hewitt-El falsely testified in three or four murder cases prosecuted by the WCPO and the DPD.

200.   On September 6, 1995, attorney William Daniel ("Daniel") sent a letter to WCPO Chief Prosecuting Attorney John O'Hair ("O'Hair") about Hewitt-El's false testimony.

201.   In the letter Daniel stated that he was the attorney for Anton Mann ("Mann") who was charged with murder by WCPO attorney Tom Dawson ("Dawson").

202.   In the letter, Daniel stated that Dawson told him to speak to Mary O'Connell ("O'Connell") who was the attorney for Hewitt-El.

203.   In the letter, Daniel stated that Hewitt-El testified during a Preliminary Examination Hearing that Mann had confessed to the murder when

Mann and Hewitt-El were both in custody at the 9th floor lockup of DPD headquarters.

204.   In the letter, Daniel stated that O'Connell told him that Hewitt-El recanted his testimony about Mann's admission and would take the Fifth Amendment at Mann's trial.

205.   In the letter, Daniel stated that O'Connell told him that Hewitt-El is a witness in three or four other murder cases where Hewitt-El falsely claimed that the defendants had confessed to the murders to Hewitt-El while they were in custody at the 9th floor lockup of DPD headquarters.

206.   In the letter, Daniel stated that he spoke with attorneys Robert Slameka and Ben Gorek who also represented clients whom Hewitt-El falsely testified against.

207.   Daniel concluded the letter by stating that he was seeking the WCPO's guidance and to raise concern about fabricated confessions on behalf of his client, as an officer of the court, and as a citizen of the community.

208.   In 1998, Hewitt-El wrote a letter to an individual named Islam Lacino-X.

209.   In the letter, Hewitt-El identified Twilley, Cowan, Allen Bey, and an individual named Terry as inmate informants in the 9th floor lockup at DPD headquarters.

210.   In the letter, Hewitt El stated that both the DPD and the WCPO knew about inmate informants in the 9th floor lockup at DPD headquarters providing false confessions in exchange for favors and deals.

211.   On June 27, 2001, Hewitt-El signed an affidavit regarding his false testimony in criminal cases.

212.   In the affidavit, Hewitt-El stated that DPD detectives from the homicide unit promised to help him if he testified to overhearing confessions from his fellow inmates in the 9th floor lockup of DPD headquarters.

213.   In the affidavit, Hewitt-El stated that DPD detectives from the homicide unit provided him with the information he would need to testify.

214.   Numerous individuals have been wrongfully convicted as a result of Defendant County's widespread policy and/or custom of the WCPO obtaining false statements and false testimony for use against criminal defendants and concealing the fact that the statements and testimony were false from courts and criminal defendants, including but not limited to Ramon Ward and the additional examples set forth below.

215.   Bernard Howard was wrongfully convicted of murder based upon an inmate informant's false statement that Mr. Howard's co-defendants had implicated Mr. Howard in the crime.

216.   Larry Smith was wrongfully convicted of murder based upon the false testimony from an inmate informant that Mr. Smith had confessed to the crime.

217.   Lacino Hamilton was wrongfully convicted of murder based upon the false testimony from an inmate informant that Mr. Hamilton had confessed to the crime.

218.   Defendant County's policy and/or custom of the WCPO obtaining false statements and false testimony for use against criminal defendants and concealing the fact that the statements and testimony were false from courts in criminal cases and from criminal defendants was and/or is so persistent and widespread that 27 wrongfully-convicted individuals who spent a total of 415 years wrongfully imprisoned have been exonerated since 2018.

219.   In 2020, a total of 120 wrongfully-convicted individuals were exonerated in the entire United States of America.

220.   Defendant County and its policymakers had/have actual knowledge of the policy and/or custom of the WCPO obtaining false statements and false testimony for use against criminal defendants and concealing the fact that the statements and testimony were false from courts and criminal defendants, yet have taken no action to remedy the problems.

221.   Defendant County and its policymakers approved the policy and/or custom of the WCPO obtaining false statements and false testimony for use against

criminal defendants and concealing the fact that the statements and testimony were false from courts and criminal defendants, and were deliberately indifferent to the resulting constitutional violations including, but not limited to, unlawful arrests, unlawful detentions pursuant to legal process, the use of fabricated evidence at criminal trials, concealment of exculpatory evidence at criminal trials, and malicious prosecutions.

222.   Defendant County and its policymakers disregarded the known and obvious consequence of the constitutional violations that resulted from the policy and/or custom of the WCPO obtaining false statements and false testimony for use against criminal defendants and concealing the fact that the statements and testimony were false from courts and criminal defendants.

223.   Defendant County's policy and/or custom of the WCPO obtaining false statements and false testimony for use against criminal defendants and concealing the fact that the statements and testimony were false from courts and criminal defendants was a proximate cause of Ramon Ward's damages and injuries.

224.   Defendant County's policy and/or custom of the WCPO obtaining false statements and false testimony for use against criminal defendants and concealing the fact that the statements and testimony were false from courts and criminal defendants may continue to this day.

225.   The Fourth Amendment to the United States Constitution provides in pertinent part that "The right of the people to be secure in their persons … against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause … particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV.

226.   The Fourteenth Amendment to the United States Constitution provided in pertinent part that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, §1.

227.   Title 42 of the United States Code, Section 1983 provides that "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceedings for redress." 42 U.S.C. §1983.

## CAUSES OF ACTION

### COUNT I:  42 U.S.C. § 1983 – False Arrest
### Against Defendant Childs, Defendant Jorgensen, Defendant Sanders, and Defendant Thomas

228.   Ramon Ward hereby re-alleges and incorporates by reference each of the preceding paragraphs as if fully restated herein.

229.   The above-named individual Defendants arrested Ramon Ward.

230.   There was no probable cause to arrest Ramon Ward.

231.   The above-named individual Defendants acted under of color of law.

232.   The arrest of Ramon Ward resulted in damages and injuries to Mr. Ward.

### COUNT II:  42 U.S.C. § 1983 – Unlawful Detention Pursuant to Legal Process Against Defendant Agacinski, Defendant Westveld, Defendant Napp, Defendant Childs, Defendant Maynard, Defendant Collins, Defendant Jorgensen, Defendant Sanders, and Defendant Thomas

233.   Ramon Ward hereby re-alleges and incorporates by reference each of the preceding paragraphs as if fully restated herein.

234.   Ramon Ward was detained pursuant to legal process based upon evidence fabricated by the above-named individual Defendants and exculpatory evidence concealed by the above-named individual Defendants.

235.   There was neither probable cause nor reasonable suspicion to detain Ramon Ward.

236.   The above-named individual Defendants acted under of color of law.

237.   The unlawful detention of Ramon Ward resulted in damages and injuries to Mr. Ward.

238.   The unlawful detention of Ramon Ward was undertaken pursuant to Defendant County's policy and/or custom of the WCPO obtaining false statements and false testimony for use against criminal defendants and concealing the fact that

the statements and testimony were false from courts and criminal defendants, as set forth above.

### COUNT III:  42 U.S.C. § 1983 – Due Process/Fair Trial: Fabrication of Evidence and Suppression of Evidence Against Defendant Agacinski, Defendant Westveld, Defendant Childs, Defendant Maynard, Defendant Collins, Defendant Jorgensen, Defendant Sanders, and Defendant Thomas

239.   Ramon Ward hereby re-alleges and incorporates by reference each of the preceding paragraphs as if fully restated herein.

240.   The above-named individual Defendants knowingly fabricated evidence that was used against Ramon Ward at his criminal trial.

241.   The evidence fabricated by the above-named individual Defendants affected the decision of the jury which convicted Ramon Ward.

242.   The above-named individual Defendants suppressed evidence favorable to Ramon Ward.

243.   The suppressed evidence was material to the guilt and punishment of Ramon Ward.

244.   The above-named individual Defendants acted under color of law.

245.   The fabrication of evidence and suppression of evidence by the above-named individual Defendants resulted in damages and injuries to Ramon Ward.

246.   The fabrication of evidence against Ramon Ward and the suppression of evidence favorable to Mr. Ward was undertaken pursuant to Defendant County's

policy and/or custom of the WCPO obtaining false statements and false testimony for use against criminal defendants and concealing the fact that the statements and testimony were false from courts and criminal defendants, as set forth above.

**COUNT IV:  42 U.S.C. § 1983 – Malicious Prosecution**
**Against Defendant Agacinski, Defendant Westveld, Defendant Napp,**
**Defendant Childs, Defendant Maynard, Defendant Collins, Defendant**
**Jorgensen, Defendant Sanders, and Defendant Thomas**

247.   Ramon Ward hereby re-alleges and incorporates by reference each of the preceding paragraphs as if fully restated herein.

248.   A criminal proceeding was initiated against Ramon Ward and the above-named individual Defendants made, influenced, and/or participated in the decision to prosecute.

249.   There was a lack of probable cause for the criminal prosecution against Ramon Ward.

250.   As a consequence of the legal proceeding, Ramon Ward suffered a deprivation of liberty apart from the initial seizure.

251.   The criminal proceedings against Ramon Ward have been resolved in Mr. Ward's favor.

252.   The malicious prosecution by the above-named individual Defendants resulted in damages and injuries to Ramon Ward.

253.   The malicious prosecution of Ramon Ward was undertaken pursuant to Defendant County's policy and/or custom of the WCPO obtaining false statements

and false testimony for use against criminal defendants and concealing the fact that the statements and testimony were false from courts and criminal defendants, as set forth above.

### COUNT V:  42 U.S.C. § 1983 – Conspiracy
**Against Defendant Agacinski, Defendant Westveld, Defendant Napp, Defendant Childs, Defendant Maynard, Defendant Collins, Defendant Jorgensen, Defendant Sanders, and Defendant Thomas**

254.   Ramon Ward hereby re-alleges and incorporates by reference each of the preceding paragraphs as if fully restated herein.

255.   The above-named individual Defendants had a single plan to convict Ramon Ward for the murders of Cornell and Gilliam.

256.   The above-named individual Defendants shared a conspiratorial objective to deprive Ramon Ward of his constitutional rights.

257.   The above-named individual Defendants committed overt acts in furtherance of the conspiracy.

258.   The above-named individual Defendants acted under color of law.

259.   The conspiracy to deprive Ramon Ward of his constitutional rights resulted in damages and injuries to Mr. Ward.

260.   The conspiracy to deprive Ramon Ward of his constitutional rights was undertaken pursuant to Defendant County's policy and/or custom of the WCPO obtaining false statements and false testimony for use against criminal defendants

and concealing the fact that the statements and testimony were false from courts and criminal defendants, as set forth above.

### COUNT VI: 42 U.S.C. § 1983 – Failure to Intervene
### Against Defendant Agacinski, Defendant Westveld, Defendant Napp, Defendant Childs, Defendant Maynard, Defendant Collins, Defendant Jorgensen, Defendant Sanders, and Defendant Thomas

261.　Ramon Ward hereby re-alleges and incorporates by reference each of the preceding paragraphs as if fully restated herein.

262.　As set forth above, the above-named individual Defendants falsely arrested Ramon Ward, unlawfully detained Mr. Ward pursuant to legal process, used fabricated evidence against Mr. Ward, suppressed evidence favorable to Mr. Ward, and maliciously prosecuted Mr. Ward.

263.　Each above-named individual Defendants observed and/or had reason to know that Ramon Ward was falsely arrested, unlawfully detained pursuant to legal process, had fabricated evidence used against him, had evidence favorable to him suppressed, and was maliciously prosecuted.

264.　Each above-named individual Defendants had an opportunity to intervene in the false arrest of Ramon Ward, the unlawful detention of Mr. Ward pursuant to legal process, the use of fabricated evidence against Mr. Ward, the suppression of evidence favorable to Mr. Ward, and the malicious prosecution of Mr. Ward.

265.   Each above-named individual Defendants failed to intervene in the false arrest of Ramon Ward, the unlawful detention of Mr. Ward pursuant to legal process, the use of fabricated evidence against Mr. Ward, the suppression of evidence favorable to Mr. Ward, and the malicious prosecution of Mr. Ward.

266.   Each above-named individual Defendants acted under color of law.

267.   The failure to intervene in the constitutional violations suffered by Ramon Ward resulted in damages and injuries to Mr. Ward.

268.   The failure to intervene in the constitutional violations suffered by Ramon Ward was undertaken pursuant to Defendant County's policy and/or custom of the WCPO obtaining false statements and false testimony for use against criminal defendants and concealing the fact that the statements and testimony were false from courts and criminal defendants, as set forth above.

### COUNT VII:  42 U.S.C. § 1983 – Failure to Protect
### Against Defendant Childs, Defendant Jorgensen, Defendant Sanders, Defendant Thomas and Defendants Unknown Employees of the Wayne County Prosecutor's Office and the Detroit Police Department

269.   Ramon Ward hereby re-alleges and incorporates by reference each of the preceding paragraphs as if fully restated herein.

270.   As set forth above, the above-named individual Defendants failed to protect Ramon Ward from the violent sexual assault by Cowan in the 9th floor lockup of DPD headquarters.

271.   As set forth above, the above-named individual Defendants acted with deliberate indifference to a substantial risk of serious harm to Ramon Ward.

272.   Ramon Ward was incarcerated in the 9th floor lockup of DPD headquarters under conditions that posed a substantial risk of serious harm.

273.   The above-named individual Defendants knew that Ramon Ward faced a substantial risk of serious harm in the 9th floor lockup of DPD headquarters but failed to take reasonable measures to reduce the risk of harm.

274.   Each above-named individual Defendants acted under color of law.

275.   The failure to protect Ramon Ward resulted in damages and injuries to Mr. Ward.

## COUNT VIII:  42 U.S.C. § 1983 – Policy and/or Custom of the WCPO Fabricating Evidence and Suppressing Evidence Against Defendant County

276.   Ramon Ward hereby re-alleges and incorporates by reference each of the preceding paragraphs as if fully restated herein.

277.   As set forth above, the above-named individual Defendants falsely arrested Ramon Ward, unlawfully detained Mr. Ward pursuant to legal process, used fabricated evidence against Mr. Ward, suppressed evidence favorable to Mr. Ward, and maliciously prosecuted Mr. Ward.

278.   As set forth above, Defendant County had/has a policy of the WCPO obtaining false statements and false testimony for use against criminal defendants

and concealing the fact that the statements and testimony were false from courts and criminal defendants.

279.   As set forth above, Defendant County had/has a custom of tolerance and/or acquiescence of the WCPO obtaining false statements and false testimony for use against criminal defendants and concealing the fact that the statements and testimony were false from courts and criminal defendants.

280.   Defendant County made a deliberate choice to have a policy and/or custom of the WCPO obtaining false statements and false testimony for use against criminal defendants and concealing the fact that the statements and testimony were false from courts and criminal defendants.

281.   Defendant County's policy and/or custom of the WCPO obtaining false statements and false testimony for use against criminal defendants and concealing the fact that the statements and testimony were false from courts and criminal defendants was the moving force behind the false arrest of Ramon Ward, the unlawful detention of Mr. Ward pursuant to legal process, the use of fabricated evidence against Mr. Ward, the suppression of evidence favorable to Mr. Ward, and the malicious prosecution of Mr. Ward.

282.   Defendant County's policy and/or custom of the WCPO obtaining false statements and false testimony for use against criminal defendants caused the false arrest of Ramon Ward, the unlawful detention of Mr. Ward pursuant to legal

process, the use of fabricated evidence against Mr. Ward, the suppression of

evidence favorable to Mr. Ward, and the malicious prosecution of Mr. Ward.

283.   Defendant County's policy and/or custom of the WCPO obtaining

false statements and false testimony for use against criminal defendants and

concealing the fact that the statements and testimony were false from courts and

criminal defendants resulted in damages and injuries to Ramon Ward.

## COUNT IX:  Michigan State Law – False Arrest
### Against Defendant Childs, Defendant Jorgensen, Defendant Sanders, and Defendant Thomas

284.   Ramon Ward hereby re-alleges and incorporates by reference each of

the preceding paragraphs as if fully restated herein.

285.   The above-named individual Defendants arrested Ramon Ward.

286.   There was no probable cause to arrest Ramon Ward.

287.   The arrest of Ramon Ward resulted in damages and injuries to Mr.

Ward.

## COUNT X:  Michigan State Law – Malicious Prosecution
### Against Defendant Agacinski, Defendant Westveld, Defendant Napp, Defendant Childs, Defendant Maynard, Defendant Collins, Defendant Jorgensen, Defendant Sanders, and Defendant Thomas

288.   Ramon Ward hereby re-alleges and incorporates by reference each of

the preceding paragraphs as if fully restated herein.

289.   The above-named individual Defendants caused, initiated, instituted,

and/or continued a criminal prosecution against Ramon Ward.

290.   The criminal proceedings against Ramon Ward terminated in Mr. Ward's favor.

291.   There was no probable cause for causing, initiating, instituting, and/or continuing the criminal prosecution and/or proceeding against Ramon Ward.

292.   The above-named individual Defendants caused, initiated, instituted, and/or continued the criminal prosecution and/or proceeding against Ramon Ward with malice and/or a purpose other than that of bringing Mr. Ward to justice.

293.   Ramon Ward suffered a deprivation of liberty as a result of the criminal prosecution and/or proceeding.

294.   Ramon Ward suffered a special injury in the form of a seizure of his person.

295.   The above-named individual Defendants are liable to Ramon Ward for treble damages pursuant to Michigan Compiled Laws Annotated 600.2907.

**COUNT XI:  Michigan State Law – Abuse of Process**
**Against Defendant Agacinski, Defendant Westveld, Defendant Napp,**
**Defendant Childs, Defendant Maynard, Defendant Collins, Defendant**
**Jorgensen, Defendant Sanders, and Defendant Thomas**

296.   Ramon Ward hereby re-alleges and incorporates by reference each of the preceding paragraphs as if fully restated herein.

297.   The above-named individual Defendants acted with an ulterior purpose in the criminal prosecution and/or proceeding against Ramon Ward.

298.   The above-named individual Defendants acted improperly and/or irregularly in the use of process during the criminal prosecution and/or proceeding against Ramon Ward.

299.   The above-named individual Defendants' abuse of process resulted in damages and injuries to Ramon Ward.

### COUNT XII:  Michigan State Law – Intentional Infliction of Emotional Distress
### Against Defendant Agacinski, Defendant Westveld, Defendant Napp, Defendant Childs, Defendant Maynard, Defendant Collins, Defendant Jorgensen, Defendant Sanders, and Defendant Thomas

300.    Ramon Ward hereby re-alleges and incorporates by reference each of the preceding paragraphs as if fully restated herein.

301.   The above-named individual Defendants engaged in extreme and outrageous conduct.

302.   The above-named individual Defendants acted with intent and/or recklessness.

303.   The above-named individual Defendants' conduct caused severe emotional distress to Ramon Ward.

### COUNT XIII:  Michigan State Law – Gross Negligence
### Against Defendant Childs, Defendant Jorgensen, Defendant Sanders, Defendant Thomas and  Defendants Unknown Employees of the Wayne County Prosecutor's Office and the Detroit Police Department

304.   Ramon Ward hereby re-alleges and incorporates by reference each of the preceding paragraphs as if fully restated herein.

305.   As set forth above, the above-named individual Defendants failed to protect Ramon Ward from the violent sexual assault by Cowan in the 9th floor lockup of DPD headquarters.

306.   As set forth above, the conduct of the above-named individual Defendants was so reckless that it demonstrated a substantial lack of concern for whether injury resulted to Ramon Ward.

307.   The conduct of the above-named individual Defendants was the proximate cause of Ramon Ward's injuries and damages.

Wherefore Plaintiff, Ramon Ward respectfully requests that the Court enter judgment in his favor and against Defendants, County of Wayne, Robert Agacinski, Nancy Westveld, Janet Napp, Monica Childs, Danny Maynard, Dale Collins, Fred Jorgensen, Tony Sanders, Mark Thomas, and Unknown Employees of the Wayne County Prosecutor's Office and the Detroit Police Department, awarding compensatory damages, costs, and attorneys' fees against each Defendant, along with punitive damages against each of the individual Defendants, injunctive and equitable relief against Defendant, County of Wayne, as well as any other relief the Court deems appropriate.

Respectfully Submitted on behalf of Plaintiff, Ramon Ward by

s/John Smietanka
John Smietanka (P20610)
Joseph Daly (P81312)
Counsel for Plaintiff
SMIETANKA LAW GROUP
4175 Parkway Place Dr. #104
Grandville, MI 49418
T: (616) 667-2217
E: jas@smietankalaw.com

s/Jarrett Adams
Jarrett Adams (New York State Bar Number 5455712)
Counsel for Plaintiff
THE LAW OFFICE OF JARRETT ADAMS, PLLC
40 Fulton Street, Floor 7
New York, NY 10038
T: & F: (646) 880-9707
E: jadams@jarrettadamslaw.com